LAWRENCE GAUTSCHE et al., Respondents, v STATE OF NEW YORK et al., Appellants. (Claim Nos. 61248, 61249, 61250.)

Third Department, April 12, 1979

#### APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Vernon Stuart* and *Shirley Adelson Siegel* of counsel), for appellants.

*N. Sandy Konigsberg* for respondents.

#### OPINION OF THE COURT

STALEY, JR., J.

Claimants, Century Productions, Ltd., and Starworld Industries, Ltd., are professional fund raising organizations owned and controlled by the claimant, Lawrence Gautsche. On or about January 14, 1976, the Police Benevolent Association of

District Attorneys Offices, City of New York, Inc. and the District Attorneys Investigation Police Benevolent Association (both hereinafter called PBA) contracted with Century Productions, Ltd. for its services in the solicitation of advertisements from the public for a bicentennial journal to be published by the PBA. The terms of the contract provided that Century would pay 25% of the gross receipts to the PBA and would retain 75% of the gross receipts for its services and expenses connected with the solicitation. This arrangement was made in disregard of the prohibition on fund raising by employees promulgated by the District Attorneys' offices of Kings, Bronx and New York Counties.

After the commencement of the solicitations, the office of the Attorney-General and the Police Department of the City of New York received numerous complaints concerning the fund raising practices. An investigation instituted at the request of the Attorney-General by Herbert J. Wallenstein, the Assistant Attorney-General in charge of the Charity Frauds Bureau, revealed that the solicitation efforts were aimed at small merchants and businessmen located throughout the City of New York with the contributors believing that the money raised was to be used "to help the local police", or to assist policemen who had been laid off.

On or about June 30, 1976, Attorney-General Louis J. Lefkowitz, by his duly designated Deputy Assistant Attorney-General Wallenstein, applied to Supreme Court in the County of New York for an order enjoining the claimants from continuing to solicit contributions from the general public and from conducting any further businesses.

In his supporting affidavit, Assistant Attorney-General Wallenstein stated that: "[a]ll of the merchants interviewed also indicated that the solicitors advised that funds were being used to assist laid off policemen. Language such as 'we're taking things into our own hands and helping the laid off policemen and their health fund' is invariably used by the solicitors."

The affidavit further stated that the failure to advise the public of the percentage split of the gross proceeds, the misrepresentation of the solicitations, and the fact that a police union was involved, in addition to the recent massive layoffs of New York City police officers, all contributed to a climate inducive to fraud in which the solicitors conspired to take advantage of an unsuspecting public.

Supreme Court issued an order to show cause with a temporary restraining order on June 30, 1976 and an action for a permanent injunction was commenced by the Attorney-General at the same time.

On July 6, 1976, a press release was issued by the Attorney-General commenting on the legal action taken wherein, among other things, it was stated: "Although the fund raisers told potential contributors that the money would be used to assist laid off policemen, such was not the case, the Attorney General said."

On or about July 1, 1977, each of the claimants filed a claim to recover damages for libel and slander against the State of New York and the office of the Attorney-General of the State of New York. Each of the claims alleged two causes of action.

The first cause of action alleged that the supporting documents used in obtaining the order to show cause were, upon information and belief, false, malicious and executed with reckless disregard for the truth.

The second cause of action alleged that "Herbert J. Wallenstein, an employee of the State Attorney General's Office, knowingly, recklessly, and maliciously, advised the press that the claimant herein engaged in fraudulent activities and misrepresentation to the public."

On August 8, 1977, the Attorney-General moved to dismiss the claims on the grounds, among others, that the acts complained of are privileged, and that a claim against the office of the Attorney-General of the State of New York cannot be maintained in the Court of Claims.

The Court of Claims dismissed the claims against the office of the Attorney-General and dismissed the first cause of action, but refused to dismiss the second cause of action contained in the claim against the State.

The State now asserts that it was error to refuse to accord an absolute privilege to a press release statement issued by the Attorney-General through his duly designated deputy in an action to prevent a charity fraud. The Attorney-General, being an executive official of cabinet rank, is absolutely privileged to publish false and defamatory matter of another in exercising the functions of his office so long as the publication has some relation to the executive proceeding in which he is acting *(Cheatum v Wehle,* 5 NY2d 585).

The Attorney-General has a statutory duty to investigate

fraud or illegality in the carrying on, conducting or transacting of business and is authorized to apply to the Supreme Court for an order enjoining the continuance of such business (Executive Law, § 63, subd 12).

In *Ward Telecommunications & Computer Servs. v State of New York* (42 NY2d 289, 290), the Court of Appeals held "that official audit reports issued on behalf of the State Comptroller by the Division of Audit and Accounts are subject to an absolute privilege in any action for defamation based on the content of such reports."

The court rejected the contention that there should only be a qualified privilege because the audit report was prepared by employees of the division rather than by the Comptroller himself. While this rejection was based, in part, upon section 43 of the Executive Law which authorizes the Comptroller to assign examination and audit work to examiners appointed by him pursuant to law, the court also said (pp 291-292): "As a practical matter, such assistance and delegation obviously are unavoidable. To hold that a report prepared and signed by the Comptroller personally is subject to an absolute privilege, whereas one prepared under his supervision by examiners appointed by him for that purpose and released on his responsibility is not so protected would be wholly to ignore the realities of the operation of State government. It has been held that the absolute privilege of the executive head of department extends to those of subordinate rank who exercise delegated powers *(Barr v Matteo,* 360 US 564; *Lombardo v Stoke,* 18 NY2d 394; *Lawrence Univ. v State of New York,* 41 AD2d 463)."

The Assistant Attorney-General in charge of the Charity Frauds Bureau has been delegated the duty of investigating and prosecuting fraud or illegality in the carrying on of solicitations for charitable purposes. Public policy dictates that the Attorney-General disclose to the public the facts concerning any fraudulent or illegal activities uncovered in the process of any investigation, as well as the facts concerning any prosecution therefor. Here, Assistant Attorney-General Wallenstein in the investigation, prosecution and disclosure of the activities of the claimants was exercising the powers delegated to him by the Attorney-General, and all statements made by him having relation to such investigation and prosecution are absolutely privileged.

The order should be reversed, on the law and the facts, without costs, and the claims dismissed.

GREENBLOTT, J. P., MAIN, MIKOLL and HERLIHY, JJ., concur.

Order reversed, on the law and the facts, without costs, and claims dismissed.