150 P.3d 262

**Terry GODDARD, Monica Goddard, Office of the Arizona Attorney General, Petitioners,**

v.

**The Honorable Kenneth L. FIELDS, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,**

**George H. Johnson; Johnson International, Inc., Real Parties in Interest.**

**No. 1 CA–SA 06–0114.**

Court of Appeals of Arizona, Division 1, Department E.

Jan. 16, 2007.

Review Granted May 22, 2007.

176

Terry Goddard, Arizona Attorney General, By Lisa K. Hudson, Assistant Attorney General, Michael K. Goodwin, Michael M. Walker, Phoenix, Attorneys for Petitioners.

Jones Skelton & Hochuli PLC, By Christopher G. Stuart, John M. DiCaro, Phoenix, Attorneys for Real Parties in Interest–Respondents.

Margrave Celmins, Whiteman PC, By Lat J. Celmins, Michael L. Kitchen, Patrick J. VanZanen, Phoenix, Attorneys for Real Parties Johnson–Counterclaimants.

## OPINION

OROZCO, Judge.

¶1 Terry Goddard, Monica Goddard and the Office of the Arizona Attorney General (collectively, the Attorney General) petitioned this court for special-action relief, challenging the trial court's order finding that the Attorney General is not entitled to absolute immunity, but only qualified immunity for the allegedly defamatory statements he published in a press release regarding a lawsuit his office is pursuing. For the following reasons, we accept jurisdiction, but deny relief.

## FACTS AND PROCEDURAL HISTORY

¶2 This special action arises from a lawsuit the Attorney General's Office filed on behalf of five State agencies against real estate developer, George Johnson, and his related entities (collectively, the Johnson De-

fendants). The Johnson Defendants acquired title to property bordering state trust lands, which they intended to transform into a residential and business development. The suit alleged that the Johnson Defendants violated numerous laws applicable to developers in their position.

¶ 3 Johnson and one of his entities (Counterclaimants) filed a counterclaim against the Attorney General alleging that he personally issued a press release making numerous false and defamatory statements directed at the Johnson Defendants.

¶ 4 Although the Attorney General stood behind the truth of his statements, he moved to dismiss the defamation counterclaim by asserting that his position as an executive officer entitled him to "an *absolute privilege* to publish defamatory matter concerning another in communications made in the performance of his official duties." The trial court found that the Attorney General did not have absolute immunity but only qualified immunity. The Attorney General sought special action relief from the trial court's order denying him absolute immunity for his statements in the press release regarding the litigation.

### SPECIAL ACTION JURISDICTION

¶ 5 Generally, we "declin[e] jurisdiction when the relief sought is to obtain review of orders denying motions to dismiss." *Henke v.Super. Ct. (Kessler)*, 161 Ariz. 96, 98, 775 P.2d 1160, 1162 (App.1989). However, we allow interlocutory appeals of motions to dismiss based on an immunity claim "because any benefit of that immunity is lost if the party claiming it is forced to defend himself." *Darragh v. Super. Ct. (Michael)*, 183 Ariz. 79, 80, 900 P.2d 1215, 1216 (App.1995). Accordingly, because the Attorney General "does not have a plain, speedy or adequate remedy by appeal, we accept jurisdiction." *Id.* (citing Ariz. R.P. Spec. Act. 1).

### STANDARD OF REVIEW

¶ 6 In reviewing a trial court's denial of a motion to dismiss, " 'we consider the facts alleged in the complaint to be true' ... and 'determine whether the complaint, construed in a light most favorable to the plaintiff sufficiently sets forth a valid claim.' " *Douglas v. Governing Bd. of the Window Rock Sch. Dist. No. 8*, 206 Ariz. 344, 346, ¶ 4, 78 P.3d 1065, 1067 (App.2003). (Citations omitted.) Additionally, we review de novo whether an immunity exists in a defamation case when the speaker raises an immunity defense. *Sobol v. Alarcon*, 212 Ariz. 315, 317 n. 2, ¶ 10, 131 P.3d 487, 489 n. 2 (App.2006). (Citations omitted.)

### MERITS

¶ 7 Absolute immunity insulates an individual from legal liability from "all acts, no matter how malicious," whereas qualified immunity shields "only those acts done in good faith." *Chamberlain v. Mathis*, 151 Ariz. 551, 554, 729 P.2d 905, 908 (1986) (citing *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)). The interest favoring providing executive officials with immunity for conduct within the scope of their employment is that government executives must be allowed to perform their official duties without being obligated to justify their past actions in court. *Id.* "The arguments favoring official immunity are countered by the legitimate complaints of those injured by [a] government official[']s" malicious comments. *Id.* at 555, 729 P.2d 905, 729 P.2d at 909.

¶ 8 In *Chamberlain v. Mathis*, the Arizona Supreme Court, after considering the competing interests, adopted a general rule of qualified immunity, bolstered by an objective malice requirement for executive government officials. In doing so, the court expressly rejected the rationale supporting absolute immunity for executive state officials articulated in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). *Chamberlain*, 151 Ariz. at 557, 729 P.2d at 911. It recognized, however, that there might be a narrow exception and "some government offices that require absolute immunity." *Id.* at 558, 729 P.2d at 912 (citing *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)). Finally, it denied absolute immunity to the Director of the Arizona Department of Health Services after concluding that "in the vast majority of cases, qualified

immunity will adequately protect state executive officials." *Id.* (Citation omitted.)

¶ 9 Because absolute immunity is the exception to the general rule of qualified immunity, to successfully assert a claim for absolute immunity from personal liability, the Arizona Supreme Court required that an executive government official demonstrate that absolute immunity is essential to conducting public business. As the Arizona Supreme Court more specifically articulated, it has "endorsed the use of governmental 'immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy.'" *Id.* (Citation omitted.)

¶ 10 Based on the facts of this case and after considering the Attorney General's arguments regarding why he is entitled to absolute immunity, we conclude that the trial court did not err in denying him absolute immunity.

¶ 11 The Attorney General claims that his governmental function will be severely hampered if he is not granted absolute immunity. Specifically, he alleges that forcing him "to defend against the Counterclaim at the same time that [he] is prosecuting the underlying case will severely hamper [his] ability to prosecute the underlying action and to represent the client agencies."

¶ 12 In adopting the general rule of qualified immunity, the Arizona Supreme Court recognized "that qualified immunity [alone] may offer executive public officials insufficient protection if plaintiffs, by merely alleging malice can force public officials to engage in intensive discovery and cumbersome, time-consuming" litigation. *Id.* Thus, the court adopted an extended protection: it requires that plaintiffs filing defamation claims against public officials establish proof of objective, rather than subjective, malice. *Id.* at 559, 729 P.2d at 913.

¶ 13 We are not persuaded by the Attorney General's argument that being forced to defend against the defamation counterclaim will impair his ability to effectively represent the client agencies in the main suit against the Johnson Defendants, primarily because the trial court contemplates conducting separate trials of the two actions. The trial court also has notified the parties that separating the claims will not be necessary if the defamation counterclaims do not survive pretrial motions for summary judgment. Because the trial court foresees conducting separate trials to minimize any potential conflicts and recognizes that such a solution may not be necessary if the defamation counterclaims do not survive summary judgment, we conclude that the Attorney General's ability to prosecute the underlying case against the Johnson Defendants will not be sufficiently impaired to require granting him absolute immunity.

¶ 14 The Attorney General further argues that he will be unable to adequately defend himself against the defamation counterclaim because he has no authority to waive the confidentiality of privileged communications without his clients' consent and "[l]ogically, at least some of the information available to the Attorney General when the press release was issued ... would have included privileged attorney-client communications and information." But the Attorney General has not indicated and we cannot imagine what type of privileged attorney-client communications and information could support a decision to issue a press release and yet still be undiscoverable.

¶ 15 The Attorney General also cautions that denying him absolute immunity would result in defendants asserting defamation counterclaims as a defense strategy, causing "the Attorney General and his assistants [to] consider their potential liability before initiating and while prosecuting such actions." However, the Attorney General has not adequately explained how qualified immunity with the additional requirement that the Counterclaimants must prove an objective malice standard is insufficient protection. Under the objective malice standard, "qualified immunity will protect a public official if the facts establish that a reasonable person, with the information available to the official, 'could have formed a reasonable belief that the defamatory statement in question was true and that the publication was an appropriate means for serving the interests which justified the privilege.'" Joel F. Handler and William A. Klein, *The Defense of Privi-*

*lege in Defamation Suits Against Government Executive Officials,* 74 Harv. L.Rev. 44, 68 (1960). (Footnote omitted.) Adding an objective malice standard to qualified immunity provides additional protection because it "would tend to allow significant judicial control of the jury through directed verdicts and to permit many cases to be disposed of on summary judgment." *Id.* at 68–69.

¶ 16 The Attorney General also argues that established public policy entitles him to absolute immunity for issuing press releases describing litigation his office is pursuing, including allegedly defamatory statements. He further asserts that established public policy requires him to inform citizens about the litigation he undertakes on their behalf.

¶ 17 We reject the Attorney General's contention that the statutory requirement mandating that he report his litigation and other activities to the Governor and the Legislature through an annual report, which is open and available to the general public, is the source of the public policy requiring him to inform citizens of matters occurring in his office.

¶ 18 Although the Attorney General is required to provide an annual report of his office's activities to the Governor and the Legislature, *see* Arizona Revised Statutes (A.R.S.) section 41–194.B (2004), none of the statutes delineating his duties, *see* A.R.S. §§ 41–191 to –198 (2004 and Supp.2006), require him to issue press releases, communicate with the public regarding pending cases or provide information relating to defendants outside of court proceedings. As Counterclaimants assert, issuing press releases and holding press conferences about litigation his office is pursuing are highly discretionary functions as is the information he chooses to disseminate to the public.

¶ 19 The dissent relies on Restatement (Second) of Torts § 591 (1977), and *Barr,* 360 U.S. at 573, 79 S.Ct. 1335, for the proposition that "the heads of executive departments are entitled to a greater degree of protection from defamation claims than lesser governmental officials because 'the higher the post, the broader the range of responsibilities, and the wider the scope of discretion.' "

¶ 20 However, in *Chamberlain,* the Arizona Supreme Court noted that Restatement (Second) § 591 follows *Barr.* 151 Ariz. at 556, 729 P.2d at 910. Thus, by expressly choosing to reject the rationale in *Barr,* the court also rejected the rationale contained in Restatement (Second) § 591.

¶ 21 Finally, the Attorney General and the dissent cite several cases from other jurisdictions that have granted their attorney generals absolute immunity in defamation cases arising when the attorney general publishes matters about individuals in the performance of their official duties. The Attorney General maintains that the these cases "reflect[ ] the strong public interest in allowing high executive officers to inform the public on important matters, unfettered by the fear that they may be sued for defamation." The problem with this argument is that all of these cases follow *Barr,* Restatement of Torts § 591, or Restatement (Second) of Torts § 591. *People ex rel Hartigan v. Knecht Services, Inc.,* 216 Ill.App.3d 843, 159 Ill.Dec. 318, 575 N.E.2d 1378, 1390 (1991)(citing *Barr,* 360 U.S. at 571, 79 S.Ct. 1335); *Gautsche v. State,* 67 A.D.2d 167, 415 N.Y.S.2d 280, 282 (App.Div.1979)(citing *Barr,* 360 U.S. at 564, 79 S.Ct. 1335); *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892, 895 (1952)(citing Restatement of Torts § 591 (1938)), *overruled on other grounds by Commonwealth v. Schab,* 477 Pa. 55, 383 A.2d 819 (1978); *Salazar v. Morales,* 900 S.W.2d 929, 931 (Tex.App.1995)(citing *Barr,* 360 U.S. at 564, 79 S.Ct. 1335); *id.* at 932 (citing Restatement (Second) of Torts § 591); *Gold Seal Chinchillas, Inc. v. State,* 69 Wash.2d 828, 420 P.2d 698, 701 (1966)(citing *Barr,* 360 U.S. at 564, 79 S.Ct. 1335). Additionally, *Salazar* explicitly states that the Arizona Supreme Court's *Chamberlain* opinion is the only opinion rejecting *Barr.* 900 S.W.2d at 933. Because the Arizona Supreme Court rejected the rationale in *Barr* and Restatement (Second) § 591, we cannot agree with the Attorney General or the dissent that these cases are persuasive authority.

¶ 22 In arriving at this holding, we note that this opinion does not address situations in which the Attorney General *is* the policy maker, such as when he makes the decisions

concerning the State of Arizona's position. Those situations typically involve cases in which the Attorney General possesses statutory authority to sue without the involvement of a state agency or officer, including criminal prosecutions and consumer protection. In such situations, the Attorney General is not simply acting for state officials who, under *Chamberlain,* are entitled to only qualified immunity.

¶ 23 We find support for this holding in *Green Acres Trust v. London,* wherein the Arizona Supreme Court held that defendant attorneys were not entitled to an "absolute privilege for the oral and written communications published by them to" the press before a lawsuit is filed. 141 Ariz. 609, 616, 688 P.2d 617, 624 (1984). Although the court also noted that there may be other circumstances in which absolute privilege may be appropriate for certain types of statements published before the initiation of proceedings, *id.* at 615, 688 P.2d at 623, it denied the defendant lawyers absolute privilege for potentially defamatory statements made to the press before a lawsuit was filed. *Id.* The court held "that both the content and manner of extrajudicial communications must bear 'some relation to the proceeding.' The requirement[ ] ... that the recipient of the extra-judicial communication have some relationship to the proposed or pending judicial proceeding for the occasion to be privileged is sound." *Id.* at 614, 688 P.2d at 622. (Citations omitted.) Similarly, in this case, we find no relationship between the press release issued by the Attorney General and the judicial proceedings at hand.

¶ 24 Based on the narrowness of the absolute immunity exception articulated in *Chamberlain,* the additional protection of an objective malice standard and the Attorney General's insufficient support to demonstrate that issuing press releases potentially containing defamatory information relating to litigation pursued by his office is essential to

conducting public business, we deny the Attorney General the relief he requests.[1]

## CONCLUSION

¶ 25 For the above reasons, in the exercise of our discretion, we accept special-action jurisdiction and deny relief.

CONCURRING: PATRICK IRVINE, Judge.

HALL, Judge dissenting.

HALL, Judge dissenting.

¶ 26 In *Chamberlain,* our supreme court established that, as a general rule, state executive officials are entitled only to qualified immunity in defamation actions brought against them in their official capacity. 151 Ariz. at 558, 729 P.2d at 912. The defendant in *Chamberlain* was the Director of the Arizona Department of Health Services, an office that the court characterized as "roughly comparable to that of a federal cabinet officer." *Id.* at 554, 729 P.2d at 908.[2] The court stated that "the general rule of qualified immunity announced in *Grimm*[3] should govern the case before us [,]" but it did not foreclose the possibility that absolute immunity might be appropriate for other high-level executive officers. Indeed, as noted by the majority, *supra,* ¶ 8, the court recognized that "there may be some government offices that require absolute immunity," but believed that "in the vast majority of cases, qualified immunity will adequately protect state executive officials." *Id.* at 558, 729 P.2d 905, 729 P.2d at 912.

¶ 27 Thus, *Chamberlain* does not require the result reached by the majority. Moreover, it appears that every other state that recognizes the concept of high-level executive officer immunity extends such a defense to its attorney general. I believe that, if the doctrine of absolute immunity for high-level executive officers is to have any real applica-

---

1.  To hold otherwise, would create a situation in which public officials that only have qualified immunity, would always have the Attorney General issue press releases on their cases, in order to avoid potential litigation.

2.  The director is appointed by the governor from a list of names submitted by a search committee and serves at her pleasure. A.R.S. § 36–102 (2003).

3.  *Grimm v. Ariz. Bd. of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977).

tion in Arizona, a constitutional executive officer such as the attorney general must be absolutely privileged to make defamatory statements when acting pursuant to the authority of his office. The majority, however, construes the *Chamberlain* exception so narrowly as to render it, as a practical matter, non-existent. Because my views on this subject differ substantially from those of my colleagues, I discuss them more fully below.

¶ 28 As a preliminary matter, I note that the rationale for allowing high-level executive officers to defeat defamation actions by claiming absolute immunity is not simply, as suggested by the majority, to relieve such officers from the personal burden of being hauled into court to defend their statements. Rather, as explained in the Restatement (Second) Torts § 591 cmt. a (1977), absolute immunity is intended to protect the public's interest in the effective operation of government:

> Complete freedom in performing the duties of the important executive offices of the ... State requires the absolute privilege to publish defamatory matter of others when the publications are incidental to the performance of the duties of the office. The public welfare is so far dependent upon a reasonable latitude of discretion in the exercise of functions of high executive offices that their incumbents may not be hindered by the possibility of a civil action for defamation in connection therewith.

The public interest in encouraging public officials to speak with complete candor without fear of civil liability reaches its zenith when the public official is a high-level executive official such as the attorney general. *See Barr*, 360 U.S. at 573, 79 S.Ct. 1335 (the heads of executive departments are entitled to a greater degree of protection from defa-

mation claims than lesser governmental officials because "the higher the post, the broader the range of responsibilities, and the wider the scope of discretion").

¶ 29 The majority cites *Chamberlain* for the proposition that the Arizona Supreme Court has "endorsed the use of governmental 'immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy.'" 151 Ariz. at 558, 729 P.2d at 912 (quoting *Ryan v. State*, 134 Ariz. 308, 311, 656 P.2d 597, 600 (1982)). The majority then rejects the attorney general's claim that denying him absolute immunity will severely hamper a governmental function or thwart an established public policy. If this is the correct test to determine whether the attorney general is entitled to claim absolute immunity, my colleagues may be right. However, here we are dealing with the issue of high-level executive immunity rather than *governmental* immunity, which are supported by differing rationales, and the proposal in *Ryan* for determining the availability of governmental (i.e., sovereign) immunity[4] is ill-suited as a standard for determining the availability of executive officer immunity. Indeed, in *Ryan*, in which the supreme court abandoned the public/private duty doctrine, it nonetheless "hasten[ed] to point out that certain areas of immunity must remain [,]" including high-level executive immunity. 134 Ariz. at 310, 656 P.2d at 599. But after *Chamberlain*, which public officials may claim high-level executive officer immunity?

¶ 30 The attorney general is Arizona's chief legal officer, A.R.S. § 41–192(A) (2004), and is one of only five constitutional officers comprising the executive department, all of whom are elected.[5] As such, he is the peo-

---

4. The full quote from *Ryan* is: *"Employing the spirit of the Stone decision, we propose* to endorse the use of governmental immunity as a defense only when its application is necessary to avoid a severe hampering of a governmental function or thwarting of established public policy." 134 Ariz. at 311, 656 P.2d at 600. (emphasis added). In response to the invitation issued it in *Ryan*, the legislature in 1994 adopted the Actions Against Public Entities or Public Employees Act, which is codified at A.R.S. 12–820 to 12–826 (2003). The Act restored in part the doctrine of sovereign immunity abolished by *Stone v. Ariz.*

*Highway Comm'n*, 93 Ariz. 384, 381 P.2d 107 (1963), but did not impact high-level executive immunity. *See* 12–820.05(A) ("Except as specifically provided in this article, this article shall not be construed to affect, alter or otherwise modify any other rules of tort immunity regarding ... public officers as developed at common law....").

5. The four other officers of the executive department are the governor, secretary of state, state treasurer, and superintendent of public instruction. Ariz. Const. art. 5, § 1. Each of these

ple's lawyer and it is paramount that he be able to communicate fully and effectively with the public—his "client"—regarding the activities of his office. The harm to the public would be substantial if an attorney general hesitated in explaining the activities of his office for fear of otherwise incurring tort liability.[6]

¶ 31 My view on this issue is consistent with the law in other states. Indeed, every state court that recognizes some form of high-level executive officer immunity that has addressed the issue has concluded that its attorney general is absolutely immune from common-law liability for such communications, including press releases or similar statements concerning litigation. *See, e.g., People ex rel Hartigan v. Knecht Services, Inc.,* 216 Ill.App.3d 843, 159 Ill.Dec. 318, 575 N.E.2d 1378 (1991) (press release regarding litigation); *Gautsche v. State,* 67 A.D.2d 167, 415 N.Y.S.2d 280 (N.Y.App.Div.1979) (same); *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (Penn.1952) (release to press of letter alleging that assistant district attorney was a Communist), *disapproved on other grounds by Com. v. Schab,* 477 Pa. 55, 383 A.2d 819 (1978); *Salazar v. Morales,* 900 S.W.2d 929 (Tex.App.1995) (statements made to press concerning termination of assistant attorney general); *Gold Seal Chinchillas, Inc. v. State,* 420 P.2d 698 (Wash.1966) (press release concerning litigation).

¶ 32 As a matter of public policy, I believe the best approach to this issue is set forth in the Restatement § 591(b):

An absolute privilege[7] to publish defamatory matter concerning another in communications made in the performance of his official duties exists for

. . . .

(b) a governor or other superior executive officer of a state.

¶ 33 The Restatement position, which is followed by the majority of states, accommodates *Chamberlain's* acknowledgement that some high-level executive officers might be entitled to absolute immunity by permitting a case-by-case determination whether a particular office holder, other than the governor, qualifies as a "superior executive officer." At the very least, however, the attorney general, as one of five elected heads of Arizona's constitutional executive departments would fall within the category of superior executive officer and would be entitled to claim absolute immunity when communicating with the public in matters concerning his official duties. "All of the state courts that have considered the question have agreed that the absolute privilege . . . protects at least the governor [and] the attorney-general. . . ." Restatement § 591 cmt. c.

¶ 34 The majority attempts to dismiss my reliance on § 591(b) of the Restatement with the comment, ¶ 20, *infra,* that, "by expressly choosing to reject the rationale in *Barr,* [*Chamberlain*] also rejected the rationale contained in Restatement (Second) § 591." In *Barr,* the United States Supreme Court

officers is subject to significant institutional pressures and intense media scrutiny that dampen any ardor to make outrageous or false public statements. For example, in addition to standing for election once every four years, each of these officers is, unlike the department head in *Chamberlain,* subject to recall. Ariz. Const. art. 8, § 1. Moreover, as a practicing attorney, the attorney general faces the prospect of state bar disciplinary proceedings if he makes extrajudicial statements that violate ethical rules. *See, e.g.,* Ariz. R. Sup.Ct. 42, Ethical Rule 3.6 (2004) (Trial Publicity).

**6.** The press release issued by the attorney general in this case, entitled "Terry Goddard Files Lawsuit Over Developer's Destruction of State Resources," was a two-page summary of a twenty-nine page multi-count civil action the attorney general filed on behalf of five state agencies. As

explained in the press release, the lawsuit "stems from Johnson's attempt in 2003 to construct a large residential community in southern Pinal County and his work on the banks of the Little Colorado River in Apache County" and alleges "numerous violations of state law and destruction of the State's natural and archeological resources[.]" A complete copy of the attorney general's press release is available at http://www.azag.gov/press—releases/2005/Feb05.html.

**7.** "Absolute privilege" is the term traditionally used to describe the absolute immunity given government officials in defamation actions. *See Chamberlain,* 151 Ariz. at 554 n. 1, 729 P.2d at 908 n. 1 (noting that the terms "immunity" and "privilege" are used interchangeably, but opting to "use 'immunity' because it better describes the substantive effect of the asserted defense").

held that all executive officers, regardless of rank, were absolutely privileged to make defamatory statements in the course of their official duties. 360 U.S. at 570–71, 79 S.Ct. 1335. That position appears as § 591(a) of the Restatement, and applies to "any executive or administrative officer of the United States." *Chamberlain* rejected *Barr's* expansive rule of absolute immunity, expressed in Restatement § 591(a), as have most other state courts. *See* Restatement § 591 cmt. c ("The greater number of the state courts have not made the extension to the point of the federal rule and some have expressly confined the absolute privilege to superior officers of the States."). Clearly, however, notwithstanding the majority's contrary suggestion, *Chamberlain* did not establish a rigid rule precluding absolute immunity for *all* state executive officials. Instead, the supreme court left the door open for some high-level executive officers to assert absolute immunity in a manner consistent with Restatement § 591(b). By its decision today, the majority closes that door.[8]

¶ 35 Under my proposed analysis based on § 591(b), because the attorney general necessarily qualifies as a superior executive officer, the resolution of the issue of absolute immunity in this case would depend on the answer to the following question: Was the attorney general acting in the performance of his official duties when his office issued the press release? My answer to this question is "yes" even though, as the majority points out, none of the statutes that delineate the duties of the attorney general require him to issue press releases regarding the initiation of litigation. This is so because, notwithstanding the lack of specific statutory authorization, the public nonetheless has a right to be informed by the attorney general of actions taken by him in his official capacity.

As explained by the Restatement, the phrase "performance of his official duties"

> does not mean that the publication must be one that the officer in question is required to make, as when the head of a department is required by law to file an annual report concerning its affairs. It is enough that the publication is one that the officer is authorized to make in his capacity as an officer.

§ 591 cmt. f.

¶ 36 Until now, no jurisdiction had found the lack of a specific statute authorizing its attorney general to make press releases to be an impediment to a claim of absolute immunity in such circumstances. *See, e.g., Gold Seal Chinchillas,* 420 P.2d at 701 ("No statutory delineation of such responsibility is necessary, however, inasmuch as the Attorney General, as an elected officer of cabinet rank in state government, has an implicit duty by virtue of his position to inform the people of the state of Washington of actions taken in his official capacity."); *see also Hultman v. Blumenthal,* 67 Conn.App. 613, 787 A.2d 666, 674 (2002) ("The defendant was informing the public of an investigation duly conducted by his office and was carrying out the government policy of reporting to the public those facts that the attorney general claimed supported the allegations of medicaid fraud."). In my opinion, because the issuance of the press release served to inform the public of the activities taken by the attorney general in his official capacity, it is a communication for which he should be afforded absolute immunity.

¶ 37 In summary, I believe the attorney general, as a constitutional executive officer, should be absolutely immune from lawsuits arising from communications made by him in the performance of his official duties.

---

8. The majority holds the door slightly ajar for "situations in which the Attorney General is the policy maker." ¶ 22, *supra.* By this comment, the majority apparently sees a relevant distinction between situations when the attorney is acting directly on behalf of the state, e.g., in consumer fraud actions, and when, as is more commonly the case, he is giving legal advice or acting on behalf of a department of the state. The parties do not rely on the distinction drawn by the majority and my research has not disclosed any other state court that embraces such a distinction. Although the attorney general's authority is more limited when representing a state agency, as the state's chief legal officer, he is responsible for prosecuting all "proceedings in which the state or an officer thereof in his official capacity is a party." A.R.S. § 41–193(A)(1) (2004). More importantly, his duty to keep the public informed of his official activities is not dependent on the source of his statutory authority.

Therefore, I respectfully dissent from the majority's contrary holding.